**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **KENNETH BERNARD ALEXANDER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:19-CV-511-K-BH** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Kenneth Bernard Alexander (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability and disability insurance benefits (DIB) under Title II of the Social Security Act and supplemental security income (SSI) under Title XVI of the Social Security Act. (*See* docs. 1, 14.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED**, and the case **REMANDED** for reconsideration.

## I.  BACKGROUND[2]

On November 6, 2015, Plaintiff filed his applications for DIB and SSI, alleging disability beginning on June 26, 2010.[3] (doc. 11-1 at 17, 38, 85, 98, 111.) His claims were denied initially on March 30, 2016 (*id.* at 17), and upon reconsideration on May 24, 2016 (*id.*). On June 1, 2016, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 174-76.) He

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

[3]Plaintiff amended his alleged onset date to July 2, 2014, at his hearing before the ALJ. (*See* doc. 11-1 at 17, 38, 322.)

appeared and testified at a hearing on January 22, 2018.  (*Id.* at 36-63.)  On May 23, 2018, the ALJ issued a decision finding him not disabled.  (*Id.* at 17-30.)[4]

Plaintiff timely appealed the ALJ's decision to the Appeals Council on May 23, 2018.  (*Id.* at 5-7.)  The Appeals Council denied his request for review on January 4, 2019, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 5.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

A.    **Age, Education, and Work Experience**

Plaintiff was born on February 18, 1971, and was 46 years old at the time of the hearing. (*Id.* at 43.)  He attended high school and went to college for a semester.  (*Id.*)  He had past relevant work in the Paratransit Division of the Dallas Area Rapid Transit (DART). (*Id.*)

B.    **Relevant Medical Evidence[5]**

On April 19, 2013, Dr. Samina Zakiuddin noted that Plaintiff underwent a cerebral infarction in 2010 and 2011, which had caused right side weakness.  (*Id.* at 584.)  Dr. Cornelia Tan referred Plaintiff to Dr. Kemeni Tenku, a neurologist, for the evaluation of his weakness and falls.  (*Id.* at 563.)  On April 25, 2014, Plaintiff was seen by Dr. Tenku and admitted to the hospital to undergo an expansive nervous system evaluation.  (*Id.* at 565.)

On April 28, 2014, Plaintiff had a general neurology consultation to address bilateral leg pain and an unstable gait.  (*Id.* at 545.)  He reported that in 2006 he had cramps in both hands and feet,

---

[4]A prior ALJ found Plaintiff not disabled under Title II of the Social Security Act on July 1, 2014.  (*Id.* at 17, 38, 64-66, 67-75.)  On September 30, 2015, the Appeals Council upheld that decision, which became the final decision of the Commissioner.  (*Id.* at 80-83.)  The ALJ in this case did not find a basis for reopening the prior decision.  (*Id.* at 17.)

[5]Because Plaintiff's appeal focuses on the alleged failure to account for limitations resulting from his carpal tunnel syndrome with neuropathy in his right hand, only the medical evidence relating to that impairment is discussed.

and he was diagnosed with an intracranial cyst. (*Id.*) He reported that he had a stroke in 2010 that caused right side weakness, and that he had another stroke in 2011. (*Id.*) The MRI, however, did not did show evidence of a prior stroke. (*Id.* at 547, 556, 558.) At the time of his consultation, he denied any trauma to his right hand. (*Id.* at 545.) He reported he was unable to work due to increased weakness, but he was independent with all activities of daily living. (*Id.* at 549.)

On April 29, 2014, at a follow up visit with neurology, Plaintiff's hand grip on the right side was 4/5 and "appear[ed] more 2/2 to [right] wrist swelling and pain." (*Id.* at 550.) The EMG showed evidence of right median mononeuropathy at the wrist (carpal tunnel syndrome). (*Id.* at 551.) There was no evidence of polyneuropathy or myopathy, but it was noted that a normal study does not definitively exclude myopathy. (*Id.*) His labs were normal, except for a mild elevation of creatine kinase (CK), to 633. (*Id.* at 556.) He was provided a right wrist splint for pain management. (*Id.* at 558.) An occupational therapist found that he presented with right hand numbness and pain due to carpal tunnel syndrome, and that he could benefit from outpatient occupational therapy. (*Id.* at 559.)

On June 6, 2014, Dr. Tan noted that Plaintiff had right wrist pain and a decreased range of motion, tenderness, deformity, and decreased strength. (*Id.* at 537.) A knot on Plaintiff's right hand that radiated up his forearm was determined to be a ganglion cyst, and he was referred to a plastic surgeon. (*Id.*)

On July 10, 2014, Dr. Meredith Anne Bryarly, a neurologist, noted that Plaintiff was first seen at Parkland Hospital, where he had a thorough work-up for gait instability and muscle spasms. (*Id.* at 532.) His work-up was significant only for an elevated CK level and mild median mononeuropathy on EMG. (*Id.*) His discharge diagnosis was mild carpal tunnel syndrome and

muscle spasms.  (*Id.*)  It was noted that Plaintiff wore a brace on his right wrist at night for the carpal tunnel syndrome.  (*Id.* at 533.)

On September 17, 2014, Plaintiff reported to Dr. Tan that he was experiencing extremity muscle cramping lasting seven minutes.  (*Id.* at 528.)  He was given dicyclomine 20 mg tablets.  (*Id.* at 529.)  On November 14, 2014, Dr. Bryarly noted that Plaintiff was previously seen for mild carpal tunnel syndrome and muscle spasms.  (*Id.* at 524.)  At that time, his work-up was significant for an elevated CK level and mild median mononeuropathy on EMG/NCS.  (*Id.*)  He was initially started on baclofen, but this was not helpful, so he was prescribed gabapentin.  (*Id.*)  Plaintiff did not start the gabapentin due to financial constraints, although he planned to start it soon.  (*Id.*)  He reported doing about the same as he was at discharge because he was still having problems with "muscle spasms."  (*Id.*)  If he sat for a long time, his leg would give out when he tried to stand.  (*Id.*)  If he lay down for a long time, he got cramps in his feet, hands, and legs, and nothing seemed to help. (*Id.*)  An EMG conducted on April 29, 2014, revealed carpal tunnel syndrome on the right side.  (*Id.*)

On June 5, 2015, Dr. Tan opined that Plaintiff was unable to work, unable to participate in activities to prepare for work at all, and was permanently disabled.  (*Id.* at 663.)  Plaintiff's primary disabling diagnosis was stroke, and his secondary diagnosis was depression.  (*Id.*)

On January 12, 2016, Plaintiff had a consultative evaluation with Dr. A. Tavarekere.  (*Id.* at 638-41.)  At that time, he had no joint tenderness or enlargements, a normal range of motion, a positive Tinel's sign, and a negative Phalens' sign.  (*Id.* at 640.)  He was diagnosed with right hand carpal tunnel syndrome.  (*Id.* at 641.)

On March 15, 2016, State Agency Medical Consultant (SAMC) Robin Rosenstock, M.D., conducted a consultative evaluation of Plaintiff's medical records from April 25, 2014.  (*Id.* at 92-

4

94.) Dr. Rosenstock noted that he was alleging disability, in part, due to carpal tunnel syndrome of the right hand, and that he complained of problems with reaching and otherwise using his hands. (*Id.* at 93.) She found that he could frequently (cumulatively more than 1/3 up to 2/3 of an eight-hour workday) lift and/or carry (including upward pulling) only ten pounds. (*Id.* at 105.) His ability to push and/or pull was unlimited, other than as shown for lift and/or carry. (*Id.*) She opined that Plaintiff suffered no manipulative limitations. (*Id.* at 93.) She also found that his activities of daily living were not significantly limited. (*Id.* at 94.) For example, he could dress, bathe, and do light house work. (*Id.*) Dr. Rosenstock ultimately concluded that Plaintiff's allegations that he suffered disabling limitations were only "partially supported" by the evidence of record. (*Id.*)

On May 21, 2016, SAMC Javier Torres, M.D., conducted a consultative evaluation of Plaintiff's medical records from April 25, 2014, to the present. (*Id.* at 121-123.) Dr. Torres noted that Plaintiff alleged disability, in part, due to carpal tunnel syndrome of the right hand. (*Id.* at 122.) He opined that Plaintiff could frequently (cumulatively more than 1/3 up to 2/3 of an eight-hour workday) lift and/or carry (including upward pulling) ten pounds and occasionally (cumulatively 1/3 or less of an eight-hour day) lift and/or carry (including upward pulling) twenty pounds. (*Id.* at 121.) Dr. Torres found that Plaintiff's activities were not significantly restricted, and his social life was "unrestricted." (*Id.* at 123.) Dr. Torres concluded that Plaintiff had no manipulative limitations, and that his allegations were only "partially supported" by the evidence of record. (*Id.* at 122-23.)

On June 1, 2016, Plaintiff was seen by Dr. Tan, and at that time, he reported aches and cramping in the hands. (*Id.* at 674.) On November 4, 2016, Dr. Tan noted that Plaintiff had suffered muscle cramps for many years and had undergone an extensive work-up to find the source, but none was discovered. (*Id.* at 687.)

5

C.    **Hearing**

On January 22, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 36-63.)  Plaintiff was represented by an attorney. (*Id.* at 38.)

1.    ***Plaintiff's Testimony***

Plaintiff testified that he last worked in DART's Paratransit Division.  (*Id.* at 40.)  Prior to that, he worked at ATC Vancom, a contractor for DART.  (*Id.*)  In both positions, he drove a passenger vehicle that did not require a commercial driver's license.  (*Id.*)  He partially lifted and assisted passengers on and off the van, but the van was equipped with a lift to assist passengers who were wheelchair bound.  (*Id.* at 41.)  He was laid off after he suffered a stroke that affected the right side of his body and could no longer pass the Department of Transportation physical.  (*Id.* at 43, 58-59.) Following his stroke, Plaintiff suffered numbness, tingling, and weakness on his right side.  (*Id.* at 44.)  His right arm, leg, and foot were impacted about equally, and he estimated that he retained about 85-90% of functionality on his left side.  (*Id.*)  He was prescribed a rolling walker that he used when he went out, but he used a cane at all times when he was at home.  (*Id.* at 44-45.)

Plaintiff was prediabetic, but he did not have to take diabetic medication.  (*Id.* at 45.)  He took metoprolol and lisinopri for high blood pressure, and sertraline for depression.  (*Id.* at 46.)  He also took amitriptyline to help with sleep and night pain, and  "dicozamine" for his prostrate.  (*Id.*)  He took methocarbamol for cramps, numbness, and sharp pains in his feet, legs, and hands.  (*Id.*)  He also took 800 mg of ibuprofen, triamcinolone cream for psoriasis, and an 81 mg aspirin.  (*Id.*)  He wore a brace on his right arm for swelling of the wrist, and it helped to ease the pain caused by stroke residuals and carpal tunnel syndrome.  (*Id.*)

Plaintiff lived with his mother and father in their residence.  (*Id.* at 46-47.)  He maintained

his space in their home and only assisted with minimal chores. (*Id.* at 47.) He could drive, but he did not. (47.) He took public transportation or rode with friends or family. (*Id.* at 47-48.)

He could stand for 30-45 minutes without his walker or cane, and after that, he got weak in the legs, and his feet and legs begin to cramp. (*Id.* at 48.) He then had to sit down for 15-20 minutes to rest. (*Id.*) He estimated that he could stand for a total of four to five hours with necessary breaks. (*Id.* at 49.) He could walk about half a block with his walker, but he could not carry anything while walking due to his fall risk. (*Id.*)

Plaintiff's right hand did not function like it once did, and it was noticeably worse than his left hand. (*Id.* at 50.) He could go up and down a couple of steps, but not very many. (*Id.*) He estimated that he could lift only five to ten pounds. (*Id.*) He could grip, feel, and handle things with his right hand, but only for a limited amount of time. (*Id.* at 50-51.)

He had not attempted to work since 2010. (*Id.* at 51.) He filled out some job applications, but he did not get any response. (*Id.*) He did not think that he could work in a position that required him to sit all day because, if he sat too long, he had cramps, numbness, and tingling in the feet and legs. (*Id.* at 51-52.)

He did a limited amount of exercise two to three times per week, such as walking half a block. (*Id.* at 52-53.) He had not noticed any significant improvement in his tolerance. (*Id.* at 54.) Most of his time was spent sitting and watching television, reading, or doing minimal chores around the house. (*Id.* at 53, 58.) Due to his medicine, he had to lie down three to four times per day for 30-40 minutes at a time. (*Id.* at 58.)

Plaintiff testified that he had issues with concentration and emotional problems, which began at the onset of his stroke. (*Id.* at 55-57.) He suffered from depression because of his limited

physical activities. (*Id.* at 55.) He was sad, disappointed, frustrated, lonely, and angry regarding his medical situation. (*Id.*) The medicine he took for depression helped to "calm" things down. (*Id.* at 56.)

He last used alcohol in November of the prior year, and he no longer drank on a weekly basis. (*Id.* at 53-54.) He stopped in 2015 or 2016, at his doctor's request. (*Id.* at 54.)

### 2. *VE's Testimony*

The VE testified, by telephone, that Plaintiff had past work as a driver, which was medium work with a SVP of 3. (*Id.* at 59.) A hypothetical individual with the same age, education, and work history as Plaintiff could: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk, and sit, six out of eight hours; occasionally climb ramps or stairs; not climb ladders, ropes or scaffolds; not crouch; not perform tasks that specifically required balancing, including on narrow objects like beams, but could ambulate and perform other postural movements using ordinary balance; use a single cane while ambulating; frequently stoop, occasionally kneel, or crawl; he had no limitations on the use of upper extremities for reaching, handling, fingering, or feeling; and he could understand, remember, and carry out detailed (or simple) but not complex instructions. (*Id.* at 60, 62.) The hypothetical individual would not be able to perform Plaintiff's past work, but there would be other work that such an individual could perform, such as a production worker; an example of a production worker is a final assembler, a sedentary job (117,500 jobs nationally). (*Id.* at 60.) He could also work as a callout operator, a sedentary job (17,220 jobs nationally), and a charge account clerk, also a sedentary job (14,860 jobs nationally). (*Id.*) The tolerance for absenteeism was one to two absences per month, and the tolerance for someone to be off task outside of their regular breaks was 8-10% of the time. (*Id.* at 61.) Normal breaks would be every two hours. (*Id.*) The

morning and afternoon breaks would be 15 minutes, and the lunch break would be approximately 30 minutes. (*Id.*)

If the hypothetical individual had a marked (1/3 to 2/3 of the workday) inability to deal with others, such as supervisors, coworkers, and the public, that would eliminate all competitive employment. (*Id.* at 62.) The VE testified that the information regarding absences or time off task did not come from the Dictionary of Occupational Titles, but her own experience. (*Id.*)

## D. **ALJ's Findings**

The ALJ issued a decision denying benefits on May 23, 2018. (*Id.* at 17-30.) At step one, she found that Plaintiff had met the insured status requirements through December 31, 2015, and had not engaged in substantial gainful activity since the alleged onset date of July 2, 2014. (*Id.* at 19.) At step two, she found that he had the following severe impairments: obesity, hypertension, mild carpal tunnel syndrome with neuropathy, and depression. (*Id.* at 20.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit 6 hours in an 8-hour workday; occasionally climb ramps/stairs, but he would be unable to climb ladders, ropes, and scaffolds, or crouch; ambulate and perform other postural movements using ordinary balance, but was precluded from performing tasks that require balancing on narrow objects like beams; frequently stoop and occasionally kneel and crawl; and use a single cane to ambulate; he had no limitations in the use of the upper extremities for reaching, handling, fingering, and feeling; and he retained the ability to

understand, remember, and carry out simple instructions.  (*Id.* at 22.)  At step four, the ALJ

determined that Plaintiff was unable to perform his past work  (*Id.* at 28.)  At step five, the ALJ

found that transferability of job skills was not material to the determination of disability because the

Medical-Vocational Rules supported a finding that he was not disabled whether or not he had

transferable job skills, but considering his age, education, work experience, and RFC, there were

jobs that existed in significant numbers in the national economy that he could perform.  (*Id.* at 29.)

Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the

Social Security Act, at any time from July 2, 2014, through May 23, 2018, the date of her decision.

(*Id.* at 30.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work,

11

> other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  RFC ASSESSMENT

Plaintiff presents one issue for review: "The ALJ failed to Incorporate Limitations Into Plaintiff's Residual Functional Capacity Assessment Based Upon the Impairments Which She Acknowledged To Be Severe." (doc. 14 at 4.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do

sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id*. Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864

13

F.2d at 343 (citations omitted).

Here, as noted, the ALJ determined that Plaintiff retained the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk, and sit, 6 hours in an 8-hour workday;  occasionally climb ramps/stairs, but he would be unable to climb ladders, ropes, and scaffolds, and crouch; ambulate and perform other postural movements using ordinary balance, but was precluded from performing tasks that require balancing on narrow objects like beams; frequently stoop and occasionally kneel and crawl; use a single cane to ambulate; he had no limitations in the use of the upper extremities for reaching, handling, fingering, and feeling; and he retained the ability to understand, remember, and carry out simple instructions.  (doc. 11-1 at 22.)

## A.   <u>Limitations</u>

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence because she failed to account for any limitations caused by the impairments found to be "severe."  (doc. 14 at 2, 4-9; doc 16 at 2-5.)  He specifically points out that the ALJ found that his carpal tunnel syndrome with neuropathy was a severe impairment, but she found that he had "no limitations in the use of his upper extremities for reaching, handling, fingering and feeling."  (doc. 14 at 5.)  The Commissioner does not dispute that the ALJ's RFC finding is inconsistent, but he argues that the evidence outlined in the ALJ's opinion provides substantial support for her RFC determination.  (doc. 15 at 4.)  He also argues that aside from Plaintiff's argument, he has failed to demonstrate that additional limitations were warranted.  (*Id.* at 2.)

In *Winston v. Berryhill*, No. 3:16-CV-419-BH, 2017 WL 1196861, at *12 (N.D. Tex. Mar. 31, 2017), *aff'd,* 755 F. App'x 395 (5th Cir. 2018), the claimant argued that remand was warranted because the ALJ erred by failing to include any visual limitations in her RFC after finding that her

history of cataracts and diabetic retinopathy requiring laser surgeries were severe impairments. *Id.* at 13. The Court noted that an inconsistency between the step two finding and the RFC generally warrants remand:

> Federal courts in Texas have found that when impairments are identified as severe at step two but an RFC does not include any limitations for those impairments, the RFC in effect contradicts the step two finding. *See Walker v. Colvin*, No. 3:14-CV-1498-L, 2015 WL 5836263, at *15 (N.D. Tex. Sept. 30, 2015) (citing cases); *Spears v. Barnhart*, 284 F. Supp. 2d 477, 483 (S.D. Tex. 2002) (noting that by failing to include any limitations, the ALJ "basically contradict[ed] the fact that he found [the claimant's] impairments to be severe"); *Norman v. Astrue*, No. SA-10-CA-849-XR, 2011 WL 2884894, at *6 (W.D. Tex. July 18, 2011) ("Similar to *Spears*, here the ALJ did not include any limitations resulting from the [impairment], contradicting his own finding that the [impairment] was 'severe.'"); *cf. Rangel v. Astrue*, No. H-08-2246, 2009 WL 2971129, at *15 & n.11 (S.D. Tex. Sept. 14, 2009) (contrasting the facts with *Spears*, the district court noted that the ALJ found the claimant's depression to be severe and assessed the appropriate mental limitations in his RFC determination for any residual effects of his depression). This inconsistency generally warrants remand. *See, e.g., Spears*, 284 F. Supp. 2d at 483-84 (finding the ALJ's failure to address the claimant's limitations related to her severe impairment was error that warranted remand); *Norman*, 2011 WL 2884894, at *6 (finding remand was warranted where the ALJ found the claimant's limitation was severe at step two, but failed to include any limitation resulting from the impairment in his RFC analysis); *Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL 4128837, at *7 (N.D. Tex. Sept. 15, 2011) (same), *adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011).

*Id.* at *12. It also noted that in those cases where reviewing courts found that an ALJ did not err in finding severe impairments at step two and not attributing any limitation to those impairments in the RFC assessment, the ALJs had considered the limitations that were encompassed by the severe impairments or otherwise accounted for the limitations in some respect prior to making a disability finding. *Id.* at *13 (citing cases). It ultimately found that the ALJ had explicitly considered the impact of her diabetes mellitus with neuropathy and her retinopathy with laser on her vision and therefore "provided a sufficient explanation showing that she considered the severe impairments in making the RFC assessment." *Id.* at *14 (citing *Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL

4128837, at *5-6  (N.D. Tex. Sept. 15, 2011)*, adopted by* 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011) ("Without *some explanation* in the record as to how plaintiff can suffer from a severe impairment, which by definition must have more than a minimal effect on plaintiff's ability to work and why such severe impairment would not have been any limitation on the plaintiff's ability to . . . [fulfill the necessary functions of] the jobs identified by the vocational expert, the decision cannot stand.") (emphasis added)).

This case is distinguishable from *Winston*.  At step two, the ALJ found that Plaintiff's "mild carpal tunnel syndrome with neuropathy" was a severe impairment.  (doc. 11-1 at 20).[6]  She then generally determined that Plaintiff's severe impairments did not meet or medically equal the severity of one of the listed impairments, but she did not specifically address his carpal tunnel syndrome in making that determination.  (*Id.* at 20-22.)  She did, however, address his neuropathy:

> The undersigned has considered the impairments listed in Appendix 1 to Subpart P of Part 404 of the Regulations and finds that claimant's impairments do not singularly or in combination meet or medically equal the required criteria of *Listing 11.04, Vascular Insult to the brain; Listing 11.14, Peripheral neuropathy* or any other listed impairment.  Although the claimant reported a history of stroke, objective evidence does not document the claimant meets the requirements of Listing 11.04.  There is also no evidence the claimant has peripheral neuropathies resulting in gross disturbance of movement, gait, or station or use of upper extremities as required for Listing 11.14.

(*Id.* at 21) (internal record cites omitted).  The ALJ found that "[t]he claimant ha[d] no limitations in the use of the upper extremities for reaching, handling, fingering, and feeling."  (*Id.* at 22) (emphasis added).  She then mentioned Plaintiff's carpal tunnel syndrome, testimony and related objective medical findings.  (*See id.* at 23-28).  She specifically noted Plaintiff's testimony about

---

[6] *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985) ("[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.") (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)); *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c) (An individual who does not have a "severe impairment" will not be found to be disabled.).

suffering with carpal tunnel syndrome in his right hand, wearing a brace on it due to his carpal tunnel syndrome and stroke, having problems using his hands for extended periods, and being able to lift, handle, and feel with his right hand with limitations. (*Id.* at 23, 25.) Medical records documented "mild" carpal tunnel syndrome. (*Id.* at 24.) An electromyography (EMG)/nerve conduction study (NCS) in April of 2014 revealed mild right medial mononeuropathy at the wrist (carpal tunnel syndrome). (*Id.*) Physical therapy treatment notes from June 2014 revealed 4/5 strength in the right upper extremity, and a MRI of the right wrist in October 2014 revealed tendinosis and mild tenosynovitis of the extensor digitorum compartment, carpal tunnel syndrome, and osteoarthritis. (*Id.*) In January 2016, Plaintiff complained of suffering with bilateral carpal tunnel syndrome since August 2014, with wrist stiffness and swelling, but reported no injections or imaging of his hands, and he was not taking medicine for the carpal tunnel syndrome. (*Id.*) His hand grip was 5/5 bilaterally, he had normal fine finger movement, he could handle small objects and button clothing, and his sensory exam was normal. (*Id.* at 25-26.)

While the ALJ mentioned some of Plaintiff's testimony and some of the more favorable objective medical findings related to his carpal tunnel syndrome, she failed to address or otherwise explain how Plaintiff's carpal tunnel could be a severe impairment but warrant no corresponding limitations in the RFC assessment in light of the other evidence. *See Martinez*, 2011 WL 4128837, at *7 ("[T]his Court cannot find that the ALJ's inclusion of the . . . severe impairment was merely meaningless verbiage[.]"); *see also Mesecher v. Berryhill*, No. 4:15-CV-0859-BL, 2017 WL 998373, at *10 (N.D. Tex. Mar. 15, 2017) ("The circumstances of some cases require 'some explanation in the record as to how [a claimant] can suffer from a severe impairment, which by definition must have more than a minimal effect on the [claimant's] ability to work and why such severe impairment

would not have had any limitation' on the claimant's ability to work.") (quoting *Martinez*, 2011 WL 4128837, at *7). For instance, Plaintiff testified that his right hand did not function the way it once did, and that it was noticeably worse than the left. (*Id.* at 50.) He estimated that he could only lift five to ten pounds, and testified that he was able to grip, feel, and handle things only for a limited amount of time. (*Id.* at 50-51.) On April 29, 2014, Plaintiff's hand grip on the right side was determined to be 4/5 but "appear[ed] more 2/2 to [right] wrist swelling and pain." (*Id.* at 550.) Finally, although SAMCs Drs. Rosenstock and Torres imposed no manipulative limitations (*id.* at 93, 122-23) on Plaintiff, the ALJ gave their opinions only "partial weight" because she found that he was even "more restricted than originally determined." (*Id.* at 27.)

In *Martinez*, the Court held that "[w]ithout some explanation in the record as to how plaintiff can suffer from a severe impairment, which by definition must have more than a minimal effect on plaintiff's ability to work and why such severe impairment wold not have had any limitation on plaintiff's ability to handle objects or pose other manipulative limitations which would affect the jobs identified by the vocational expert, the decision cannot stand[ ]", and remand is warranted. 2011 WL 4128837, at *7; *see also Mesecher*, 2017 WL 998373, at *10 ("[A] 'failure of the ALJ to include, in the RFC assessment, any limitation as a result of [an impairment] he found to be a severe impairment' may also require reversal.") (quoting *Martinez*, 2011 WL 4128837, at *6).

**B.    Harmless Error**

As a general rule, this Court "may only affirm an agency decision on the basis of the rationale it advanced below." *January v. Astrue*, 400 F. App'x 929, 932 (5th Cir. 2010) (per curiam). Harmless error is an exception to this general rule. *Id.* at 932-33. In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached

absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Because "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show he was prejudiced by the ALJ's finding that his carpal tunnel syndrome was a severe impairment but imposed no functional limitations. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, Plaintiff must show that the ALJ's absolute failure to address whether or not functional limitations were imposed casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Here, the ALJ did not explicitly address how the evidence before her regarding Plaintiff's carpal tunnel syndrome could rise to the level of a severe impairment at step two in the sequential evaluation, yet warrant absolutely no corresponding limitations in the RFC assessment. The apparent inconsistency created by these conclusions, without explanation, casts doubt on the ultimate disability determination. *See Powell v. Comm'r*, No. SAG-14-3233, 2015 WL 4715280, at *2, *3 n.2 (D. Md. Aug. 6, 2015) (noting that "[t]he key is that the reviewing [c]ourt must be able to discern the rationale underlying the apparent discrepancy" and here, because the court was left to guess about the basis of the ALJ's finding, the "apparent inconsistency" between the step three and RFC determinations was not harmless error). The error is not harmless, and remand is required.

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED,** and the case **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED** on this 29th day of February, 2020.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on all parties by mailing a copy to each of them. Pursuant to 28 U.S.C. § 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. Failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. _Douglass v. United Servs. Auto Ass'n_, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (_en banc_).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE